31 A.3d 645

CHARLES WILLIAMS, APPELLANT, v. NEW JERSEY
DEPARTMENT OF CORRECTIONS,
RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted September 21, 2011—Decided December 2, 2011.

Before Judges CUFF, WAUGH, and ST. JOHN.

*Curtin & Heefner LLP*, attorneys for appellant (*Joseph F. Kampherstein, III*, on the brief).

*Paula T. Dow,* Attorney General, attorney for respondent (*Melissa H. Raksa,* Assistant Attorney General, of counsel; *Susan M. Scott,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

Charles Williams, an inmate at the Adult Diagnostic Treatment Center (ADTC), appeals the denial of his administrative action challenging the authority of the Commissioner of the Department of Corrections (DOC) to transfer inmates from the general prison population to the ADTC. We reverse.

## I.

We discern the following facts and procedural history from the record on appeal.

In May 2009, Williams filed an administrative complaint alleging that DOC was violating the Sexual Offender Act (SOA), *N.J.S.A.* 2C:47–1 to –10, by transferring inmates to the ADTC who are ineligible for treatment at that facility because they do not meet the sentencing parameters of the SOA.

The SOA created a detailed sentencing program for certain types of sex offenders. *N.J.S.A.* 2C:47–1 requires that, when a defendant is convicted of any of the statute's enumerated sex offenses [1] and is not subject to a sentence of life imprisonment without parole,

> the judge shall order the [DOC] to complete a psychological examination of the offender.... The examination shall include a determination of whether the offender's conduct was characterized by a pattern of repetitive, compulsive behavior and,

---

[1] Those offenses are aggravated sexual assault, sexual assault, aggravated criminal sexual contact, kidnapping as defined in *N.J.S.A.* 2C:13–1(c)(2), endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of the child pursuant to *N.J.S.A.* 2C:24–4(a), endangering the welfare of a child pursuant to *N.J.S.A.* 2C:24–4(b)(4), or an attempt to commit any of those crimes.

if it was, a further determination of the offender's amenability to sex offender treatment and willingness to participate in such treatment.

If the psychological examination "reveals that the offender's conduct was characterized by a pattern of repetitive, compulsive behavior and ... that the offender is amenable to sex offender treatment and is willing to participate in such treatment," the judge must review that finding. *N.J.S.A.* 2C:47–3(a). If the judge confirms the finding, the judge is required, upon the recommendation of DOC, to sentence the offender to a term of incarceration at the ADTC "for sex offender treatment," or to a term of probation with the condition that the offender receives outpatient treatment. *N.J.S.A.* 2C:47–3(b).

In the event such an offender receives a custodial sentence of seven years or less, DOC is required to confine the offender at the ADTC "as soon as practicable after the date of sentence." *N.J.S.A.* 2C:47–3(h)(1). If the sentence imposed exceeds seven years, the offender is incarcerated at another institution chosen by the Commissioner, but "shall be transferred to" the ADTC five years before the end of the sentence if the offender is amenable to treatment and willing to participate. *N.J.S.A.* 2C:47–3(h)(2), (3). If the offender's initial psychological examination occurred more than two years prior to that time, another examination is required. *Ibid. N.J.S.A.* 2C:47–3(h)(2) and (3) provide that an offender who was initially sentenced to another facility solely because of the length of the sentence imposed shall not subsequently be transferred to the ADTC if the re-examination concludes that the offender is, at that time, either not amenable to treatment or not willing to participate.

An offender who meets the "pattern of repetitive, compulsive behavior" criterion and is amenable to sex offender treatment, but is not willing to participate, must be sentenced to another facility chosen by the Commissioner pursuant to *N.J.S.A.* 30:4–91.2. *N.J.S.A.* 2C:47–3(f). However, such an offender may request a transfer to the ADTC and shall be transferred there in the event it is determined, after the offender is re-examined, that the

offender is both amenable to and willing to participate in treatment. *Ibid.*

In his complaint, Williams asserted that DOC

(1) failed to ensure that the transferred prisoners [who were determined to be compulsive and repetitive] were within five years of the expiration of their sentences or within five years of the expiration of their minimum mandatory terms; (2) failed to provide these prisoners with the required psychological examinations prior to transfer to the ADTC; (3) failed to make a determination that these prisoners were amenable to specialized treatment; and (4) failed to make a finding that these prisoners were willing to participate in treatment.

Williams also alleged that inmates whose conduct was not determined to be repetitive and compulsive were transferred to the ADTC. He maintained that "as of March 1, 2009, approximately 130 of the approximately 680 prisoners housed at the [ADTC] were not found compulsive and repetitive."

Williams further alleged that the transfer and retention of those inmates at the ADTC has led to (1) the closing of one of two Therapeutic Community programs, (2) a dangerous environment for inmates and staff that is counterproductive to the inmates' treatment, (3) overcrowding in ADTC therapy groups, and (4) overcrowding in housing units that are beyond the facility's designed capacity, which creates a dangerous, unsafe, and unhealthy environment for inmates and staff.

We remanded Williams's initial appeal to DOC for further consideration, and subsequently granted Williams' application for assignment of counsel. DOC issued a remand report after investigating Williams's claims. In its report, DOC admits that the Commissioner has transferred inmates to the ADTC who are currently "resisting treatment." It further admits that, as of November 15, 2010, there were "168 NUA inmates housed at [the] ADTC" who were not required to receive treatment there, although each has "a history [of] sexual offenses." The report defines an "NUA inmate," otherwise known as a "not under the Act" inmate, as one who is "not eligible for specialized treatment under *N.J.S.A.* 2C:47–3(h)."

DOC nonetheless concluded that "*N.J.S.A.* 2C:47–3 does not limit the Commissioner's authority to transfer" inmates to the ADTC who are not required to receive treatment there. It maintained that such action is within the Commissioner's broad discretion and authority under *N.J.S.A.* 30:4–91.2, which authorizes the Commissioner to "designate as a place of confinement any available, suitable, and appropriate institution or facility" and "at any time [to] transfer a person from one place of confinement to another."

DOC found Williams's other claims to be unsupported. According to DOC's report, one of the ADTC's two Therapeutic Community programs was discontinued due to a lack of voluntary participants, not overcrowding. As of November 16, 2010, the remaining Therapeutic Community program had fewer participants than the maximum number it could support. In November 2010, there were 687 inmates at the ADTC, which is designed to house as many as 723 inmates.

DOC also disputes the claim that NUA inmates at the ADTC are dangerous or counterproductive to treatment. It asserts that it has instituted an appropriate treatment program; that SOA inmates are not threatened by NUA inmates housed at the ADTC; and that, when claims of sexual assault against other inmates are made, the ADTC takes appropriate action.

II.

The primary issue raised in this appeal is whether the Commissioner's broad authority to select the appropriate institution to house inmates sentenced to his custody, as conferred by *N.J.S.A.* 30:4–91.2, is in some way limited with respect to the ADTC by the provisions of the SOA.[2] Williams argues that the Commissioner's

[2] We note that DOC cites other statutory provisions, but we conclude that those arguments are without merit and do not warrant discussion in a written opinion. *R.* 2:11–3(e)(1)(E). The decision in this case turns solely on the interplay between the SOA and *N.J.S.A.* 30:4–91.2.

discretion is limited by the SOA, while DOC contends that the broad authority of *N.J.S.A.* 30:4–91.2 prevails.

### A.

Before addressing the merits of the appeal, we outline one procedural issue and set out the applicable standard of review.

First, although treated as an appeal from DOC's rejection of Williams's administrative complaint, we also view this matter as an action in lieu of prerogative writs seeking to preclude the Commissioner from housing inmates at the ADTC who are not eligible for its specialized treatment program. Actions in lieu of prerogative writs against State agencies are venued in the Appellate Division pursuant to *Rule* 2:2–3(a)(2) and *Rule* 4:69–1. *Mutschler v. N.J. Dep't of Envtl. Prot.*, 337 *N.J.Super.* 1, 9, 766 *A.2d* 285 (App.Div.), *certif. denied*, 168 *N.J.* 292, 773 *A.2d* 1156 (2001); *see also Infinity Broad. Corp. v. N.J. Meadowlands Comm'n*, 187 *N.J.* 212, 223–24, 901 *A.2d* 312 (2006); *Cent. R.R. Co. of N.J. v. Neeld*, 26 *N.J.* 172, 184–85, 139 *A.2d* 110 (1958).

Second, "[t]he judicial capacity to review administrative agency decisions is limited." *Brady v. Bd. of Review*, 152 *N.J.* 197, 210, 704 *A.2d* 547 (1997) (citing *Pub. Serv. Elec. & Gas Co. v. N.J. Dep't of Envtl. Prot.*, 101 *N.J.* 95, 103, 501 *A.2d* 125 (1985)). Generally speaking, we will "intervene only in those rare circumstances in which an agency action is clearly inconsistent with its statutory mission or with other State policy." *George Harms Constr. Co. v. N.J. Tpk. Auth.*, 137 *N.J.* 8, 27, 644 *A.2d* 76 (1994). Only if the agency's action was arbitrary, capricious, or unreasonable should it be disturbed. *Brady, supra*, 152 *N.J.* at 210, 704 *A.2d* 547.

"When interpreting a statute, our main objective is to further the Legislature's intent," and to do so we "first turn to the plain language of the statute in question." *TAC Assocs. v. N.J. Dep't of Envtl. Prot.*, 202 *N.J.* 533, 540–41, 998 *A.2d* 450 (2010) (citations omitted). We are, however, mindful that "interpreta-

tions of the statute and cognate enactments by agencies empowered to enforce them are given substantial deference in the context of statutory interpretation." *Klumb v. Bd. of Educ. of the Manalapan–Englishtown Reg'l High School Dist.*, 199 *N.J.* 14, 24, 970 *A.*2d 354 (2009) (citing *Matturri v. Bd. of Trs. of the Judicial Ret. Sys.*, 173 *N.J.* 368, 381, 802 *A.*2d 496 (2002)).

Nevertheless, an agency's interpretations, whether through regulations or administrative actions, " 'cannot alter the terms of a legislative enactment nor can they frustrate the policy embodied in [a] statute.' " *N.J. Ass'n of Realtors v. N.J. Dep't of Envtl. Prot.*, 367 *N.J.Super.* 154, 159–60, 842 *A.*2d 262 (App.Div.2004) (alteration in original) (quoting *In re Freshwater Wetlands Prot. Act Rules, N.J.A.C. 7:7A–1.1 et seq.*, 238 *N.J.Super.* 516, 526, 570 *A.*2d 435 (App.Div.1989)). Ultimately, reviewing courts are not " 'bound by the agency's interpretation of a statute.' " *Shim v. Rutgers*, 191 *N.J.* 374, 384, 924 *A.*2d 465 (2007) (quoting *In re Taylor*, 158 *N.J.* 644, 658, 731 *A.*2d 35 (1999)).

## B.

*N.J.S.A.* 30:4–91.2 provides, in relevant part, that the Commissioner, "or his duly authorized agent, may designate as a place of confinement any available, suitable, and appropriate institution or facility whether owned by the State or otherwise, and may at any time transfer a person from one place of confinement to another." In *Smith v. New Jersey Department of Corrections*, 346 *N.J.Super.* 24, 29–30, 786 *A.*2d 165 (App.Div.2001), we characterized the statute as giving the Commissioner "complete discretion in determining an inmate's place of confinement." Nevertheless, as we discuss below, we conclude that the SOA limits the Commissioner's discretion with respect to assigning inmates to the ADTC.

The SOA specifically recognizes the Commissioner's authority under *N.J.S.A.* 30:4–91.2 with respect to certain sex offenders. *N.J.S.A.* 2C:47–3(h)(2) provides that DOC "shall" initially confine an ADTC-eligible offender who receives a sentence in excess of

seven years "in a facility designated by the [C]ommissioner pursuant to" *N.J.S.A.* 30:4–91.2, rather than the ADTC. *N.J.S.A.* 2C:47–3(h)(3) provides that, if an offender's conduct was characterized as repetitive and compulsive and the offender is amenable to treatment, but the offender is not willing to participate in treatment, the Commissioner determines another facility of incarceration pursuant to *N.J.S.A.* 30:4–91.2.

In contrast, *N.J.S.A.* 2C:47–3(h)(1) provides that DOC "shall" confine an ADTC-sentenced offender who receives a sentence of seven years or less at the ADTC as soon as practical. *N.J.S.A.* 2C:47–3(h)(2) and (3) require DOC to transfer ADTC-eligible inmates to the ADTC once they are within five years of release, but only if they remain ADTC eligible. Consequently, such an inmate "shall not be transferred" to the ADTC if the inmate is either not amenable to treatment or not willing to participate. If a previously unwilling offender subsequently expresses willingness to participate in treatment and remains amenable to treatment, the Commissioner shall order a transfer to the ADTC. *N.J.S.A.* 2C:47–3(h)(2), (3). Finally, *N.J.S.A.* 2C:47–3(j) provides that an offender who has been "sentenced to a term of life imprisonment without eligibility for parole shall not be confined in the [ADTC] but shall be confined in a facility designated by the [C]ommissioner pursuant to" *N.J.S.A.* 30:4–91.2.

In *In re Civil Commitment of W.X.C.*, 204 *N.J.* 179, 196–99, 8 *A.*3d 174 (2010), *cert. denied,* —— *U.S.* ——, 131 *S.Ct.* 1702, 179 *L.Ed.*2d 635 (2011), while reviewing the Sexually Violent Predators Act (SVPA), *N.J.S.A.* 30:4–27.24 to –27.38, the Supreme Court explored the legislative policy underlying the SOA at some length. The Court concluded that the SOA and the ADTC were consciously designed by the Legislature to address the needs of sex offenders who were the most dangerous to the public, that is, those whose behavior is "both repetitive and compulsive." *W.X.C.,* *supra,* 204 *N.J.* at 196, 8 *A.*3d 174.

The Court carefully reviewed the legislative history of the SOA, which was originally applied to any sex offender whose offense

resulted from " 'any form of abnormal mental illness.' " *Ibid.* (citing *L.* 1949, *c.* 20, § 5). The SOA was amended within a year to narrow the mandate to "sex offenders clinically determined to have engaged in conduct 'characterized by a pattern of repetitive, compulsive behavior.' " *Ibid.* (citing *L.* 1950, *c.* 207, § 3). In 1998, at the same time it enacted the SVPA, the Legislature again narrowed the SOA's criteria for sentencing an offender to the ADTC by requiring that the repetitive-and-compulsive offender be both amenable to treatment and willing to participate. *Id.* at 197, 8 *A.*3d 174 (citing *L.* 1998, *c.* 72, § 3). As noted above, the same restrictions apply to the potential transfer of an SOA offender who was not originally sentenced to the ADTC, in that the offender must be both amenable and willing in order to be transferred from another institution to the ADTC.

The Court discussed the Legislature's rationale for the change as follows:

> The Legislature explained that enacting the SVPA and amending the [SOA] would "improve the management and treatment of sex offenders and thereby increase protection of the general public when sex offenders are ultimately released." Sponsor's Statement, *Statement to Assembly Bill 2101* (May 28, 1998). That is, the two new requirements of amenability and willingness were intended to limit treatment at the ADTC to those repetitive and compulsive sex offenders who are able to benefit from it most. The Legislature's decision to tighten the requirements for a sentence to the ADTC was also designed to increase the efficacy of that program based on expert advice. That is, the decision to amend the [SOA] and to focus treatment on a specific population of sex offenders was supported by recommendations made by a special task force created to study the ADTC. *See Report of the Joint Task Force to Study the Adult Diagnostic and Treatment Center* (1995) (*Task Force Report*).
>
> The *Task Force Report* recommended decreasing the population of inmates at the ADTC because "the ADTC was more effective when it had a much smaller population of inmates to treat." *Id.* at 9. By excluding "therapy refusers" and "inmates whom the treatment staff determines cannot benefit from therapy" from sentencing pursuant to the [SOA], the ADTC would afford better treatment to those most likely to benefit. *Id.* at 12. At the same time, the treatment offered at the ADTC would be more effective because of the decrease in the population. *Ibid.*
>
> [*Id.* at 197–98, 8 *A.*3d 174.]

The Court concluded from the language of the statute and the legislative history that

[a]s defined by statute, ADTC treatment therefore is directed only at specific offenders. Moreover, the treatment provided at the ADTC is particularized and is designed to meet the needs of the specific population of sex offenders that it intentionally targets. Utilizing a five-level program of treatment, *see* Kristen M. Zgoba et al., *Evaluation of New Jersey's Sex Offender Treatment Program at the Adult Diagnostic and Treatment Center: Preliminary Results,* 31 *J. Psychiatry & L.* 133, 144–45 (2003), it is geared only toward a particularized sex offender, one whose criminal sexual behavior was repetitive and compulsive, who is amenable to treatment, and who is willing to participate in treatment. Any offender who meets the repetitive and compulsive aspect of the statutory test, but who declines to accept treatment at the ADTC or is found to not be amenable to treatment, may request transfer later in a custodial term, *see N.J.S.A.* 2C:47–3(h)(2), –3(h)(3), but an offender who does not meet the essential "repetitive and compulsive" criteria is not eligible, because the statute itself is designed to address only that population of offenders.

[*Id.* at 198–99, 8 *A.*3d 174.]

Because the SOA reflects legislative policy concerning the type of sex offenders eligible for housing and treatment at the ADTC, we conclude that *N.J.S.A.* 2C:47–3(h) sets the parameters for the Commissioner's determination of whether the ADTC is a "suitable" and "appropriate" institution for the assignment of an inmate under *N.J.S.A.* 30:4–91.2. We further conclude that the Commissioner does not have the discretion to assign offenders to the ADTC whom the Legislature has determined should not be treated there.

C.

We next address the issue of whether the Commissioner has assigned inmates to the ADTC who are not statutorily eligible for such assignment because it is not a "suitable" and "appropriate" institution under *N.J.S.A.* 2C:47–3 and *N.J.S.A.* 30:4–91.2.

According to the remand report, there were "168 NUA inmates at the ADTC." The report represents that each of those NUA inmates has "committed sexual offenses and [is] in need of treatment." It does not, however, represent that their criminal "conduct was characterized by a pattern of repetitive, compulsive behavior," as required by *N.J.S.A.* 2C:47–3(h). Indeed, the Commissioner's concession that the inmates are not eligible for treat-

ment under the SOA strongly suggests that there may have been no finding of "repetitive, compulsive behavior."

The report also represents that the NUA inmates are "in need of treatment," but does not specifically assert that they are "amenable" to it, which is the requirement in *N.J.S.A.* 2C:47-3(h).[3] Although DOC may simply have been imprecise in the wording of its report, there is a difference between needing treatment and being amenable to it. As the Supreme Court observed in *W.X.C., supra,* 204 *N.J.* at 199, 8 *A.*3d 174, the language used in the SOA was not chosen by the Legislature in a "haphazard" manner.

Finally, we note that the report concedes that "a few of those [NUA] inmates are resisting treatment," but asserts that "the fact they are in a facility where treatment is readily available increases the likelihood that those inmates will agree to participate." Yet, *N.J.S.A.* 2C:47-3(h)(3) specifically prohibits the transfer of unwilling inmates to the ADTC by providing that "[i]f the report of the examination reveals that the offender is amenable to sex offender treatment, but is not willing to participate in such treatment, the offender shall not be transferred to the [ADTC]."

In *W.X.C., supra,* 204 *N.J.* at 199–200, 8 *A.*3d 174 (footnote omitted), the Supreme Court held that the Legislature's design in using far narrower language in the SOA than it did in the SVPA was "neither haphazard nor accidental" and that

> when creating the ADTC, the Legislature intentionally designed a program that could most effectively target a particular population that available treatment modalities could benefit. In that context, making certain that the offenders admitted into the program are only those who meet the statute's diagnostic criteria is a critical ingredient in the program's success. More to the point, the program operates with limited numbers of beds, for clinically significant reasons, and highly trained, but limited, numbers of personnel, with the result that it is not appropriate to expand it to offenders ... who do not meet the admission criteria.
>
> Scholarly statistical analysis has demonstrated the wisdom of this targeted approach. *See* Philip H. Witt & Natalie Barone, *Assessing Sex Offender Risk: New Jersey's Methods,* 16 *Fed. Sent'g Rep.* 170 (2004). Using statistics compiled in

---

[3] The word "amenable" is used in one of the report's point headings, but no such assertion is made in the text of the report.

2003, the most recent data that was available, that research showed that because of the [SOA's] requirements for a sentence to the ADTC, the State is able to identify the sex offenders most in need of treatment, and for whom treatment can be specifically targeted, and therefore is able to provide those individuals with treatment immediately after conviction. *Id.* at 170–72. More to the point, it allows the State to devote scarce resources to effectively treat the offenders who are likely to pose the greatest risk to the public if released without treatment. Those statistics also demonstrate the success of this approach, because in the year studied, out of the 137 repetitive-compulsive sex offenders who were released from the ADTC, only 31 (22.6%) were civilly committed under the SVPA because they were in need of further treatment. *Id.* at 172. In contrast, in the same year, 885 sex offenders were released from the general prison population and of that number, only 25 (2.8%) were found to be in need of SVPA civil commitment. *Ibid.*

The 2003 study demonstrates that the [SOA] operates to provide treatment immediately upon conviction to the category of sex offenders most likely to later face civil commitment pursuant to the SVPA. Other sex offenders may be subject to civil commitment pursuant to the SVPA, but the [SOA's] focus on certain sex offenders, even to the exclusion of others, allows the State to better treat sex offenders at the ADTC who are more dangerous and more likely to benefit from specialized treatment.

Given the specific language of the SOA, as interpreted and explained by the Supreme Court in *W.X.C.*, we are constrained to find that the Commissioner exceeded his authority under *N.J.S.A.* 30:4–91.2 and the SOA by housing inmates in the ADTC who are ineligible for such confinement under the specific provisions of the SOA, and particularly *N.J.S.A.* 2C:47–3(h)(3). By housing ineligible inmates at the ADTC, the Commissioner is housing them in an institution that the Legislature has determined is not "suitable" or "appropriate." An administrative agency " 'cannot alter the terms of a legislative enactment nor can [it] frustrate the policy embodied in [a] statute.' " *N.J. Ass'n of Realtors, supra,* 367 *N.J.Super.* at 159–60, 842 *A.*2d 262 (quoting *Freshwater Wetlands, supra,* 238 *N.J.Super.* at 526, 570 *A.*2d 435).

Although the Commissioner can seek to persuade the Legislature to expand his discretion[4] to assign non-ADTC eligible sex

[4] For example, the Legislature could amend the SOA to allow the Commissioner to transfer sex offenders who are not SOA-eligible to the ADTC under certain circumstances. In its brief, DOC argues that the assignment of NUA offenders to the ADTC has not adversely affected the treatment of ADTC-eligible offenders.

offenders to the SOA or to revise the specialized criteria for admission to the ADTC, he cannot simply ignore the parameters for treatment at the ADTC specifically established by the Legislature. Consequently, the Commissioner must review the status of NUA offenders at the ADTC and take the steps necessary to ensure that only ADTC-eligible offenders are incarcerated there, unless it is administratively feasible to establish a *separate* program for non-ADTC-eligible offenders within the same facility. That review process should be completed within 120 days.

## III.

In summary, we hold that the Commissioner does not have the authority or discretion to assign inmates to the ADTC who are not eligible for such an assignment under the SOA. We do not hold that he cannot transfer ADTC-eligible inmates from other facilities to the ADTC earlier than five years prior to the end of their sentence if they can be accommodated there. We reject Williams's argument to the contrary. We also do not hold that he cannot provide treatment to sex offenders who are not ADTC-eligible at another facility, or even through a distinct program in a separate section of the ADTC if that is feasible. We hold only that the SOA, as it currently exists, precludes the Commissioner from assigning ADTC-ineligible sex-offender inmates to the ADTC for treatment and housing with ADTC-eligible inmates.

Reversed.

---

Given the specific treatment parameters established by the SOA as outlined in *W.X.C.*, that is an argument that the Commissioner must make to the Legislature.